# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KEITH ZIEGLER AND** | ) | |
| **SHANDA ZIEGLER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CASE NO.:  2:13-CV-872-KOB** |
| **TOWER COMMUNITIES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

This FLSA matter is before the court on cross-motions for summary judgment: "Plaintiffs' Motion for Summary Judgment" (doc. 37) and Defendant Tower Communities, LLC's "Motion for Summary Judgment" (doc. 39).  Despite the titles of these motions, each is for *partial* summary judgment; the Plaintiffs' motion addresses the FLSA claim for overtime wages in Count I but not the claim for FLSA retaliation in Count II, and the Defendant's motion is also limited in scope.  The Plaintiffs responded to the Defendant's motion (doc. 43), and the Defendant responded to the Plaintiff's motion (doc. 45).  All parties filed replies (docs. 49 & 50).  These motions have received thorough briefing, with voluminous evidentiary submissions.

For the reasons stated in this Memorandum Opinion, the court FINDS that both motions are due to be GRANTED IN PART and DENIED IN PART.   More specifically,  the court WILL GRANT the Plaintiffs' motion as to Defendant's misclassification of the Plaintiffs, and also as to

the Defendant's violation of the FLSA's requirements of recordkeeping and of paying overtime wages for time actively worked on behalf of Tower.  Further, the court WILL GRANT the Defendant's motion and WILL DENY the Plaintiffs' motion as to Defendant's liability for overtime wages for on-call time other than time spent actively working on behalf of Tower.  Finally, the court WILL DENY the Defendant's motion on the issues of its liability for paying overtime wages for active overtime work; of the applicability of the fluctuating workweek method; and of its liability on the claim for FLSA retaliation.

## PROCEDURAL BACKGROUND

On May 9, 2013, the Plaintiffs, Keith and Shanda Ziegler, filed a Collective Action Complaint (doc. 1) on behalf of themselves and all others similarly situated, against Defendant, Tower Communities, LLC, asserting violations of the Fair Labor Standards Act.  The Zieglers have twice amended the initial pleading; the current pleading, "Plaintiffs' Second Amended Complaint" (doc. 28), dropped the collective class claims, listing only the two named Plaintiffs[1]. The Second Amended Complaint contained two causes of action: Count I, alleging that Tower and Steele violated the FLSA in failing to pay minimum wage compensation and overtime compensation and in misclassification of Managers despite their actual job duties; and Count II, alleging that Tower and Steele retaliated against them in violation of the FLSA when the Defendants took retaliatory adverse employment actions against them, including terminating them in retaliation for filing a complaint asserting FLSA violations.

---

[1] The Second Amended Complaint also added William Steele, III as a Defendant; however, because the Zieglers did not serve him within the time permitted by the Federal Rules of Civil Procedures, and did not respond to the court's Order to Show Cause why he should not be dismissed (doc.30), the court dismissed Defendant Steele with prejudice (doc. 31).

## FACTS

Tower does not dispute that the Zieglers are entitled to summary judgment on the claims that Tower misclassified the Zieglers and that it failed to keep time records, but Tower disputes that the Zieglers worked over forty hours per week.

Tower manages trailer and RV parks throughout the United States, including Carson Village and Hidden Valley mobile home communities in Birmingham, Alabama.  The company's home office is in California, where its part-owner, former Defendant Bill Steele, is based, and it employees roughly 200 people.  Tower is run by three Managers, and Steele is the only one of the three who manages the Alabama parks.  Steele decides how much Tower pays its Alabama park employees.  Tower generally hires husband and wife teams to manage its trailer parks, with the men generally in charge of outside maintenance work and the women generally in charge of the office and bookkeeping.

Although Steele is the Manager and Supervisor of the Alabama parks, Tower employs Janet and Dan Zuckerman as Auditor-Trainers, and their job is to travel the country in their RV, performing audits of Defendants' parks, training new managers, and helping with management changes.

*The Zieglers' Employment and Contract*

In January of 2013, Tower hired Keith and Shanda Ziegler to work at the Hidden Valley park.  They initially held the position of Assistant Managers, working under Managers Amy and Randy Pruitt, with a total salary of $2,400 per month as a couple, plus living accommodations on the park premises.  The contract valued the living accommodations provided to the Zieglers, which was the 3-bedroom/2-bath Managers' Trailer, at $243.10 per month, which is the lot rental

3

at Hidden Valley.  The contract also provided that the Zieglers had a $75.00 monthly utility

allowance, a $50.00 monthly cell phone reimbursement allowance, and a fuel allowance that

equaled at least $92.00 every month.   (Doc. 38-7, at 2).

In a separate paragraph marked "KICK-BACKS," the contract provides, "I will not accept

any payments, gifts, or other considerations ('kickbacks') from dealer, or others.  I also

acknowledge that this is illegal and detrimental to the best interests of owner."  (Doc. 41-9, at 2).

### Employment Duties

As was customary with Tower husband and wife management teams, Keith Ziegler did

the "outside" work and maintenance, and Shanda Zieger performed the "inside" work of running

the office.  She was also responsible for gardening and making bank deposits.  According to the

Zieglers' employment contract with Tower, their job duties consisted of the following:

1. Advertise, rent, and show [RV/trailer lot] spaces as they become vacant.
2.  Collect all rents when due and promptly deposit the same to owner's account or
as otherwise instructed.
3.  Clean or supervise the cleaning and preparation, of each space for re-rental.
4.  Maintain the general premises in a clean, orderly and safe condition.
5.  Perform minor maintenance as may be necessary, including, but not limited to,
such items as leaking faucets, stopped up sewer and water drains, minor repairs,
and painting.  It is understood that employee will not be required to perform, unless
otherwise indicated in this contract, major repairs or maintenance, but that
employee will do such work as will keep outside plumbing and maintenance bills
to a minimum.
6.  Care, protection, and regular inventory of maintenance equipment, supplies,
tools, and other personal property of owner.  Maintain a maintenance log for
equipment.
7.  Prepare such records and reports as may be required by employer.
8.  Be familiar with the Manager Instruction Manual and keep its bulletins updated
at all times.
9.  Adjust any complaints of tenants and enforce the rules in accordance with the
policies of employer.
10.  Report any unusual tenant problems to employer.

4

(Doc. 38-7).

Although the employment contract did not refer to the park pool, Keith Ziegler was also responsible for maintaining the pool when it was open.   Keith Ziegler acknowledged that the pool was never open under his management, but he nevertheless cleaned it and added chemicals daily.

The Zieglers' employment contract did not list driving around the park regularly or providing security as one of their job duties, and neither the Zuckermans nor any other Tower supervisor instructed the Zieglers that they must provide security.  However, Tower terminated its contract with a private security firm after the Zieglers arrived, and with that termination, Keith Ziegler decided that he would provide security, spending an hour or two regularly driving around the park to keep an eye on things.  Ziegler acknowledged that he never told the Zuckermans that he was providing security as part of his work duties, but Dan Zuckerman testified that, with the security firm termination, he knew that Keith Ziegler took over some of the security duties by answering phone calls with complaints about parties and other security matters and by driving around the park once in a while.  Dan Zuckerman testified that driving around the park at night took about 15 minutes and that he personally cruised the park once per night while on-call, but he did not specifically instruct the Zieglers to do so and he does not know how often Keith did so.

In an email dated January 29, 2013 from the Pruitts, Managers of both Birmingham Tower parks in January of 2013, referred to "daily rides around the community" and complained about Keith Ziegler failing to clean up a mess left after the removal of a mobile home on a Saturday and not discovered until the next Tuesday.   The inference was that the Pruitts understood such daily rides were part of the job of Manager and Assistant Manager.  (Doc. 53-3,

at 104).

Employment Hours

The Zieglers' employment contract with Tower stated that "[a]lthough employee must reside on the community's premises, compensation is based on a maximum of 40 hours per week." (Doc. 38-7, at 2). During their employment with Tower, the Zieglers never received any pay for hours worked over 40 per week. Steele testified that he understood that the Manager salary would "not be an issue with minimum wage, by paying them the 1,200 and giving them, you know, space rent and a house and so on and so forth." (Doc. 38-2, at 35-36). When asked whether Tower had any method of tracking the time and dates Managers worked, he responded that they were on salary and that Tower did not track the hours actually worked, other than the office hours. The Managers at Hidden Valley park are each scheduled to work office hours from 8:00 a.m. to 4:00 p.m. for five days per week with a one-hour unpaid lunch break, equaling 35 hours per week. The Zieglers similarly understood that the salary amount was all they would receive, regardless of the hours worked.

In addition to the regular office hours, Tower also required that the Managers rotate being on-call, requiring one of the Zieglers to be on-call one week during all hours the office is closed with one of the Carson Managers on-call the next week. Shanda Ziegler testified, however, that when a Ziegler on-call period occurred, both Zieglers stayed at the park except to run short errands.

According to part-owner Steele and the Zuckermans, Tower does not *require* the Manager on-call to remain on the property, as long as he or she is available to be reached by telephone. However, Janet Zuckerman acknowledged instructing the Zieglers that being no more

than 30 minutes away while on-call was a good practice and *guideline*, although that guideline is not a Tower *requirement*.   Keith Ziegler understood the instruction that they be no more than 10 to 20 minutes away while on-call if they were available by cell phone, but the Zieglers testified that they did not have cell phones until April of 2013.  They did, however, receive the $50 per month cell phone allowance for the months of  January, February and April of 2013, submitting cell phone charges for reimbursement.

Tower expected, in addition to the scheduled office work hours of 35 hours per week, that each of its Managers would work no more than five *additional* hours after hours and during on-call periods, for a total of 40 hours per week.  Steele testified that Tower did not anticipate or require that its Managers would work more than 40 hours per week, and Tower apparently did not consider the on-call hours to be working hours except when the Manager actually responded to problems and telephone calls during the on-call hours.  At the beginning of their training month, some supervisor explained to the Zieglers that the park had so much general maintenance and upkeep and that these tasks could not all be accomplished during work hours but that the Managers must nevertheless complete them.  The implication was that the Zieglers could expect to be working after normal work hours to complete the tasks and to make the park look great.

*Training*

The Zieglers received training from the Zuckermans that lasted for the first month of their employment.  During that training month, Shanda Ziegler requested that the $2,400 salary be divided with Keith receiving $2,000 per month and Shanda receiving $400 per month so that the pay would not conflict with her eligibility for Social Security benefits.  A dispute exists whether Shanda made the request because Janet Zuckerman told her to do so because Tower had had "a

lot of older managers that are in the situation," and had addressed the situation with an uneven salary split in the past.  (Doc. 38-5, at 39-40).    Zuckerman acknowledged that she initially told Shanda Ziegler the company could honor her request to do the uneven salary split.  However, part-owner Steele stopped to that arrangement and, after the first month, he required the salary division for the Zieglers to be changed to each spouse receiving pay of $1200 per month.  Steele explained that this requirement was necessary because the wife could complain that she only received $400 per month for all of the work she did.  During the training month, Dan Zuckerman suspected that Keith Ziegler was "close to working more than 40 hours in a week," so Zuckerman immediately instructed Ziegler that he was not to work overtime, and reminded him of that instruction on numerous occasions.

At the completion of the training, the Zuckermans left Alabama from February 1-11, 2013.

*Pruitts' Termination; Zieglers become Co-Managers*

After the training period, the Zieglers began reporting to the Hidden Valley Managers, Amy and Randy Pruitt, who also managed Carson Village.  But in February of 2013, shortly after the Zieglers started working with the Pruitts, Tower terminated the Pruitts.  For the next ten or eleven days, no one held the official position of Manager at either of the two parks, but the Zieglers performed all of the managerial responsibilities at both parks until the Zuckermans returned.  During this interim period, the Zieglers were working constantly, seven days per week, from 7 or 8 in the morning until night.  Tower hired someone to sit temporarily in the Hidden Valley office during the day to answer the phone and take payments, but Shanda Ziegler continued to handle Hidden Valley paperwork and otherwise functioned as its Co-Manager.  The

Zuckermans spoke to the Zieglers daily during this interim time, and the Zieglers gave them reports that all was well, and did not advise the Zuckermans about having to spend more than 40 hours a week each to manage both parks.

When the Zuckermans arrived back in town after the Pruitts' termination, they took over management of Carson Village.  In March of 2013, Tower changed the Zieglers' position from Assistant Managers to Managers of Hidden Valley, and raised each spouse's pay to $1,275 total per month, or $2,550 per couple per month. On his paycheck, Ziegler received a credit for $170 per month as "rent" excluded from federal taxable wages, but no deduction is listed on the paycheck for the $243.10 value for accommodations.  Also at the beginning of March of 2013, Tower hired Jason and Stacy Shellnut to take over management of Carson Village.

*Hours Worked as Co-Managers*

As Co-Manager of Hidden Valley park, Keith Ziegler estimated that he worked an extra two to four hours outside of scheduled work hours each weekday[2], and sixteen to twenty hours on the average weekend, for a total of seventy to eighty hours per week.  Keith Ziegler worked every weekend, beginning after he got up in the morning until evening, with the exception that he attended church on most Sunday mornings.  Shanda Ziegler claims to have worked slightly fewer hours, estimating that she worked between sixty to seventy hours per week, working five to eight extra hours total during the Monday through Friday workweek, and fifteen to twenty hours every weekend.  Although the office closed at four, Shanda Ziegler regularly worked after four, closing out the books and handling issues that arose; she regularly worked at the office until six or seven

---

[2]Shanda Ziegler said her husband worked an average of ten to twelve hours over forty hours during a workweek Monday through Friday when he was off call.

9

p.m., and at least a dozen times during the term of her employment, she stayed at the office until nine p.m.  Many of the times that she was staying until six or seven, she would be talking on the phone to Tower personnel.

Daily activity logs reflect that the Zieglers regularly worked more than 8 AM to 4:00 PM on weekdays.  Although those logs do not always support the total number of hours that the Zieglers are claiming for Monday through Friday work, the logs show that one or both Zieglers worked more than an hour late on two or more weekdays during most workweeks, and thus, support the Zieglers' testimony that they routinely worked hours significantly beyond scheduled office hours.  *See, e.g.,* Doc. 53-1, at 65, 75, 89, 103, 105,107, 114-119, 124,126, 130).

These daily logs are separate from the Zieglers' on-call logs, although some overlap exists; on-call logs reflect on-call work performed after the office was closed on weekdays and on weekends.  On-call logs do not completely verify the number of hours that the Zieglers claim to have worked, but they do support the Zieglers' claims that they regularly engaged in a significant amount of active work while on-call.  *See, e.g.,* Doc. 53-1, at 14, 18, 24, 31-32, 38-40, 53, 54-57, 66, 67, 72, 74, 76-78, 80, 91, 93, 94, 138, 139, & 174).  The record is unclear whether Tower required the Zieglers to send daily and on-call logs to Tower supervisors on a regular basis or whether Tower simply required the Zieglers to prepare the logs and have them available if their supervisors at Tower needed verification of their work.

Although the scheduled work hours reflected a one-hour unpaid lunch, and the office was closed for an hour during lunchtime, the Zieglers received uninterrupted lunch breaks only occasionally because of daily phone calls during lunchtime, forwarded from the office to their home phone, from California management or park residents or potential residents.  More than

half  the calls required one or both of them to return to the office or to leave their home to do something during the lunch hour.

Some examples of jobs that Keith Ziegler regularly found he had no time to do during the regular work hours so he performed them on weekends were mowing the lawn at the manager's spot and pressure washing.

The Zieglers were "on-call" every other week, involving being available on the nights and the weekends.  The Zieglers claim that they received calls every single week night and every single weekend day they were "on-call."  Shanda testified that the calls were "constant," and Keith explained: "We were the first ones they seemed to call for everything.  We were like the Shell answer man."  They would receive calls on everything from broken pipes, electrical issues, to fires, and even domestic disputes and break-ins.  Keith Ziegler testified: "we normally got called before the police got called."  (Doc. 38-4, at 98).

Although Tower claims that,  technically, only one Ziegler was "on-call," Shanda Ziegler testified that "on-call" tied *both* of them to the park, for all practical purposes, because each Ziegler had different duties. She did not have the skills to respond to maintenance calls nor did she feel comfortable responding to calls that needed action during the nighttime or those involving security such as an altercation.  (Doc. 38-5, at 41-42 ).   During Ziegler "on-call" periods, one of the Zieglers would leave to make bank deposits, pick up something from the other park, or pick up food, but aside from those quick errands, the practice was to stay together, physically in the park.  Only after April, when they both purchased cell phones, were they able to leave the park together, and even then they had to remain within twenty minutes from the park.

11

Because the Zieglers claim that they did not have cell phones until April of 2013[3], Keith Ziegler testified that one of them was required to stay within range of a landline phone during the on-call hours, which would be within twenty yards of their house or office.  According to Keith, the Zieglers asked the Zuckermans if Tower would buy them cell phones, and the response was no.  However, evidence reflects that although Tower may not have bought the Zieglers cell phones, it did pay them a monthly cell phone reimbursement of $50 for the months of January, February and April[4] of 2013 based upon documentation from the Zieglers of cell phone expenses, even though the Zieglers now claim that they did not have cell phones in January and February.

*Tower's Awareness of Overtime*

The evidence reflects that, as early as January of 2013, the Zuckerman and Steele had notice that Keith Ziegler was working more than 40 hours per week.  In his deposition testimony, Dan Zuckerman acknowledged: "I knew but I mentioned it to him that he ... wasn't supposed to, but that was up to him, if he wanted to get up."  (Doc. 38-6, at 33).  Dan Zuckerman also acknowledged mentioning to his wife, Janet, that Keith Ziegler was working overtime, but he did not acknowledge talking to Steele about Keith's long hours.  Dan Zuckerman claims to have reiterated to Keith the admonition  on numerous occasions that he was not to work more than 40 hours per week, and no evidence reflects that Keith Ziegler specifically explained on those

---

[3] Although the Zieglers claim not to have a cell phone until April, a January bill submitted to Tower for reimbursement  refers to a "cell phone" and a "Cricket Samsung R631." (Doc. 52-1, at 13).

[4] The April 2013 note for reimbursement is written on a Walmart bill with notes reflecting the purchase of two phones and two prepaid phone minute cards, and other evidence indicates that Tower paid to the Zieglers check number 000489 in the amount of $50 on 5/9/13, presumably in response to the reimbursement request. (Doc. 52-1, at 11-16).

occasions that he was regularly working over 40 hours and could not get the work done during a 40-hour week.

An email from Janet Zuckerman to Bill Steele dated January 29, 2013 also reflects that she was aware of Keith Ziegler's long hours *and that she communicated that awareness to Steele*: "[The Pruitts] make it sound like Keith is lazy and it is just the opposite, he is out working many mornings at 6:30 am and doesn't stop many evenings till dark." (Doc. 53-3, at 104). Even given the early sunset in January, Janet Zuckerman was describing to Steele a 10-hour work day for Keith on "many" days.

Further the Zuckermans knew from their own experience the time requirements of Property Managers for Tower parks. Their testimony varied about whether the position of Property Managers required the Zuckermans to work over 40 hours per week. At one point, Dan Zuckerman testified that the Zuckermans have performed the Manager jobs of Hidden Valley and of Carson Village, and during these periods, they each did not work more than 40 hours per week. (Doc. 46-3, at 3, ¶ 3). However, Janet Zuckerman testified that when the Zuckermans worked as Managers, at times they worked more than forty hours per work week, especially when they were on-call. (Doc. 38-3, at 163-64).

In addition, evidence reflects that Tower employees other than the Zuckermans and Steele were aware that the Zieglers routinely worked more than the scheduled work hours. Shanda Ziegler testified that when in the office working late, she was often talking on the phone to Tower personnel, such as Stacy Shellnut, the Zuckermans, or the Tower IT person, trying to figure out why mistakes had occurred in the daily reports or simply responding to requests and directives. According to Shanda Ziegler's testimony, Lupe Gonzales, the office manager at

13

Tower in Pasadena, California, was aware that the Zieglers worked seven days a week, although the discussion is not clear whether she was aware that they routinely worked every weekend or just call weekends.  Shanda Ziegler and Lupe were discussing the fact that Keith Ziegler was injured when he was working on a Sunday, and Shanda advised her that the Zieglers worked seven days a week.  Lupe laughed and said: "yeah, but that's expected.  Just don't do anything that you could get hurt on."  (Doc. 38-5, at 120).

In February of 2013, the Zieglers began to complain about work hours and wages that were "not legal."  On February 23, 2013, the Zieglers sent an email to Steele, advising him that they wanted to discuss some important issues directly with him.  The email did not specify the nature of the issues.  The Zuckermans, not Steele, responded to the email to Steele, and set up a lunch meeting between the Zuckermans and Zieglers.  Shanda Ziegler testified that she and her husband spoke to the Zuckermans about needing more money to pay their bills, which were higher than anticipated, and to compensate them for the long hours they were working. According to the testimonies of both Shanda and Keith, the Zieglers specifically complained that they were not even receiving minimum wage for the total number of work hours; the Zieglers complained that their wages were "not legal."  When the Zuckermans responded that the Zieglers had agreed to the position with the specified salary, the Zieglers said: "You can't agree to something that's not legal."  (Doc. 38-5, at 93; see Doc. 38.4, at 202 (to the same effect)).  The Zuckermans promised to relay their complaints to Steele, and later advised the Zieglers that they had spoken with Steele but that he had refused their requests.  The Zieglers commented: "that's not legal, you can't do that."  (Doc. 38-5, at 94-95).

However, the evidence does not reflect that the Zuckermans communicated to Steele that

the Zieglers had complained to them about FLSA violations or illegal wages.  The Zuckermans'

March 6, 2013 email to Steele referred to a "come to Jesus" meeting with the Zieglers and

referred to the Zieglers' financial difficulties with high utility bills and deposits, stating that they

were "struggling financially." The email did not refer in any way to FLSA violations or

complaints of overtime without appropriate pay.   (Doc. 53-3, at 109-110).

Steele acknowledges hearing from the Zuckermans that the Zieglers were not happy with

their wages, but he claims that he did not understand during their employment that they were

asserting that Tower was not paying them minimum wage and/or overtime.  He claims not to

have received Janet Zuckerman's May 20, 2013 7:49 AM email, discussed below in the

termination section, until after the termination on May 22, 2013.

*Zieglers Take Complaints Outside Tower Sphere*

After learning from the Zuckermans that Steele had supposedly heard their complaints

about not being paid legal wages for their work and had refused to change their compensation,

the Zieglers filed a claim about their wages with the Department of Labor.  The Zieglers told the

Zuckermans that they had had spoken to Angela Rice at the DOL and had been advised that

Tower was in violation of the FLSA.

On May 9, 2013, the Zieglers filed this lawsuit. The court records reflect that Tower's

Montgomery agent was served with the lawsuit on May 13, 2013, nine days before their

termination.  Steele acknowledged that CT Corp., the agent served on May 13, was Tower's

agent for service of process, but claims that he does not know when CT Corp was served and did

not first hear from CT Corp about the lawsuit.  (Doc. 38-2, at 82, p. 81).  The Zieglers reissued a

second summons on Tower Communities "c/o Any Office or Agent Carson Village Community."

15

(Doc. 6).   This summons was served on May 30, 2013, and Stacy Shelnutt signed for it.  Steele acknowledges that she called him when she received the summons and complaint, and forwarded it on to him.  Tower filed a waiver of service on June 20, 2013.

*Termination of the Zieglers*

At some point before the termination of the Zieglers on May 22, 2013, the Zieglers asked the Shellnuts to come to the Ziegler home.  When the Shellnuts came, the Zieglers reviewed the complaint about FLSA violations because the Zieglers felt that the Shellnuts were also eligible to assert those same complaints.   The Shellnuts reacted as if they were afraid.  Jason Shellnut said to his wife, "I'm not losing my job," and left.  (Doc. 38-4, at 236 p. 235).

On May 20, 2013, at 7:49 AM, two days before the Zieglers' termination, Janet Zuckerman sent Bill Steele the following email:

> Good Morning Bill
> We have received several phone calls this weekend regarding Keith and Shanda. The first being that Mr. Armstrong from Armstrong Plumbing came to speak with James, Jason and Stacy regarding Keith asking for financial kick backs which he responded that It was illegal and would not be a part of.  Dan told Stacy to get Mr. Armstrong to put it all in writing and get the information to you.  Last night we got another call from Jason (very upset) as Keith and Shanda invited them over "to look at something", [sic] when they arrived at their home Shanda brought out a pile of paperwork showing that they have started legal proceedings to sue Tower for insufficient pay for their labors.  It stated that they were not even making minimum wage and were suing to get the money owed to them.  Jason said that he got the impression that they wanted them to be a part of this lawsuit as well and he got Stacy and left.  Jason and Stacy are extremely concerned that they will somehow be dragged into this mess and wanted our help.  We told them that we appreciate all of their good work and would talk with you to let you know the situation.
> Please call so we can speak with you regarding these issues. . . .

(Doc. 56-3, at 111-12).

Steele denies receiving this email before the termination although it reflects the correct

email address, and he acknowledged receiving and reading, before the termination, the emails

sent to the same address before and after this email.   Janet Zuckerman testified that she did not

receive a notification that the email was not delivered to Steele.  Steele eventually found the

email, and his defense council produced the email in May of 2014 *after* the Zieglers' deposition

and the night *before* Steele's own deposition testimony and the deposition testimony of Janet

Zuckerman in May of 2014.  In his deposition testimony, Steele claimed that he missed the email

on May 21 when he was traveling and was reading emails on his iphone.  However, Steele also

acknowledged that he was *not* traveling on May 20, 2013, and the Zuckermans sent this email at

the beginning of the day on May 20, not the end.  Further, the email is located at the bottom of

the page and has "white space" on the rest of the upper page, where a response to the email

would be located, if any existed.  Thus, the document does not reflect the content of any response

to Zuckerman's email, but the evidence does not reflect that any witness was questioned and

asked to explain the white space.

On May 20, 2013, at 5:37 PM, the Zuckermans also wrote a second email to Steele at the

same address as the email above:

> Hi Bill,
> Just wanted to let you know that Mr. Armstrong wrote out a small affidavit regarding
> the request for a $200.00 kickback on each job performed at Hidden Valley.  We also
> have many pic's [sic] of the un-mown lawns at the park if you need them. . . .

(Doc. 38-18, at 1).

The statement, purporting to be from Barry Armstrong, plumber, said:  "In April of 2013

while repairing a broken water line at Hidden Valley, the manager, Keith Zeigler [sic] said he

would gaurauntee [sic] me more work if I let him name price and give him $200.00 off the top of

every repair job. I told him absolutely not." (Doc. 41-8, at 2). The 5:37 PM email does not purport to attach Armstrong's statement, so the documents themselves do not clarify when, or whether, Steele read Armstrong's statement on May 21.

Steele responded to the May 20 5:37 PM email in an email from his iphone dated May 21, 2013, at 7:21 AM asking: "How did u get this from Armstrong?" (Doc. 38-18, at 2). The email was apparently referring to Armstrong's statement, but Steele testified that he had not seen a copy of Armstrong's statement at the time he wrote the 7:21 AM email. (Doc. 38-2, at 55). A subsequent email from Janet Zuckerman to Steele dated May 21, 2013 at 6:23 AM, reflects that Armstrong brought the statement to Stacy Shellnut who faxed a copy of it to the Zuckermans. Janet Zuckerman at some time faxed a copy of the statement to Tower. (Doc. 38-18, at 2).

Steele traveled to Alabama on May 21, 2013 from Los Angeles. Steele testified that *after* receiving the 6:23 AM email from Janet on May 21, 2013, he made the decision to terminate the Zieglers without communicating directly with Armstrong or the Shellnuts. According to the email thread, he responded from his iphone at 7:21 AM on May 21 to the email sent at 5:37 PM on May 20. He suggests in his deposition testimony that he was probably at the airport because he used his iphone to respond to emails when traveling. If so, then at the time he was first making the decision to terminate the Zieglers, sometime after 6:23 AM, he was already in the process of flying from Los Angeles to Alabama.

According to Steele, Tower terminated the Zieglers on May 22, 2013 because Steele had received a report that Keith Ziegler had attempted to obtain a kickback from Barry Armstrong. Steele claims that he made the decision to terminate the Zieglers when he received the May 21, 2013 emails from Zuckerman, before he met with the Zieglers.

18

According to the Zieglers, Steele came to Alabama, and terminated them, advising the Zieglers that he could no longer "trust" them.  In explaining the lack of trust, Steele referred to Keith Ziegler's sending a resumé for a Tower position in Illinois, which Keith Ziegler considered ridiculous because Ziegler did not understand how applying for another Tower position could be breaching trust.  Rather, from Keith Ziegler's point of view, he had worked hard at Hidden Valley and had just saved the company over $30,000 in fire dues by realizing that the fire department was charging them for fire dues on the wrong number of homes.  Under these circumstances, he felt that Tower would be rewarding him, not firing him.  (Doc. 38-4, at 227, p. 226).

Steele also mentioned "improprieties with the vendors."  In his deposition, Keith Ziegler assumed that the improprieties referred to Armstrong's claim about Keith asking him for a kickback.  Keith  denied that he asked Armstrong for kickback and claimed that Armstrong was lying.  "There was never a conversation [about kickbacks], never.  And, I mean, what am I going to do?  I'm going to break pipes for him to fix them so he can get more business?  There is no way to get him more business in plumbing. . . ."  (Doc. 38-4, at 234, p. 233).

When Steele terminated their employment on May 22, the Zieglers asked Steele whether their termination had anything to do with the lawsuit they had filed against Tower, and Steele said: "Oh, no, no, no, no, doesn't have anything to do with that.  It's an issue of trust."  Steele did not deny knowledge about the lawsuit or act surprised when they mentioned it, although Steele denies having knowledge about the lawsuit at the time of the termination.  The Zieglers responded "okay.  We were expecting it," because they understood Steele knew about the lawsuit.  (Doc. 38-5, at 33, 266).

19

On May 22, 2013, Steele wrote an email to the Zuckermans stating: "Terminated today." (Doc. 38-18, at 1).

Steele claims that, before he terminated the Zieglers, he did not see the email Janet Zuckerman sent to him stating that the Zieglers had shown a complaint to the Shellnuts in which they alleged that they were not receiving a legal wage. Steele also testified that he personally did not receive notice or service of the Zieglers' lawsuit until about a week after the Zieglers' termination, and stated that he received personal notification when Stacy Shelnutt called him, advising him that she had received something that looked legal, and at his instruction, she mailed the legal envelope to him, unopened.

*Post-Termination*

After termination, Keith Ziegler applied for unemployment compensation with the ADOL. The "Decision on Unemployment Compensation Claim" refers to a decision of the Examiner adverse to Ziegler, disqualifying him from receiving unemployment benefits and obligating him to repay certain benefits received before the disqualification. Keith Ziegler appealed from the Examiner's determination, resulting in a hearing on April 9, 2014 before an administrative hearing officer.

Participating in the hearing with the ADOL, which took place by telephone, were the adjudicator, Keith Ziegler, his attorney, Steele, Armstrong, and Tower's attorney. The hearing decision lists the claimant as Keith Ziegler and the employer as Steele Family Trust et. al, Tower Communities LLC, and states the following relevant issue: "Whether the claimant was discharged or removed from work for a dishonest or criminal act committed in connection with work. . . ." (Doc. 41-10, at 2). Armstrong presented his statement for the hearing, and the

20

hearing decision noted that the testimony provided "was conflicting in nature"; in his deposition,
and apparently at the hearing, Ziegler asserted that Armstrong had lied.  However, Ziegler had no
documentation at the hearing date that supported any other explanation for the termination.
Tower did not provide to the Zieglers until May of 2014, after the unemployment hearing and the
deadline to appeal its determination,  a copy of Janet Zuckerman's email dated May 20, 2013 at
7:49 AM, referring to the lawsuit.

The administrative hearing officer affirmed the Examiner's determination that Keith
Ziegler was disqualified from receiving unemployment benefits, concluding as follows: "While
the testimony provided by both parties was conflicting in nature, the preponderance of evidence
shows that the employer terminated the claimant for attempting to make a deal with a plumbing
contractor in which the plumber would have set [ ] his own price for repair work and given the
claimant $200.00 'off the top' in exchange for the promise of providing the plumber with
additional work.  Thus, as the claimant's termination is considered to have been the direct result
[of] a dishonest act committed by the claimant in connection with his work with this employer,
he would be subject to the disqualifying provisions under this section of the Law." (Doc. 41-10,
at 2-3).

In the "Appeal Rights" section, the decision stated that it became final unless the Board
of Appeals received a written application for leave to appeal before April 25, 2014.  (*Id.* at 4).   In
his deposition testimony, Keith Ziegler acknowledged that he did not appeal the decision, and
stated that he was employed at the time.   In May of 2014, on the eve of the depositions of Steele
and Janet Zuckerman in the instant case, Tower's counsel produced to the Zieglers and their
counsel the email, which was dated May 20, 2013 at 7:49 AM and sent to Steele's correct email

address, discussing the Zieglers' FLSA lawsuit.  Steele acknowledged in his deposition testimony that he was aware of the email prior to May 21, 2014, the day before his deposition; he testified that he had been "familiar with this email since the case started."  (Doc. 38-2).  When counsel for the Zieglers asked why Tower had not produced the email earlier, Tower's counsel objected that the question was a discovery question, and noted that objections were pending to the breadth of the document request.  The Zieglers' counsel responded: "You can't get anything more directly on point than this," referring to the email that purported to notify Steele, prior to the Zieglers' termination,  of the Zieglers' protected conduct.

## LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id.* at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

24

## DISCUSSION

The Plaintiffs' amended complaint contains two Counts: Count I - Violation of the FLSA for failing to compensate them for hours worked and failing to pay overtime wages; and Count II - FLSA Retaliation.

The Zieglers' motion for partial summary judgment asks this court for determinations that (1) Tower violated the FLSA by misclassifying the Zieglers as salaried employees; (2) Tower failed to keep records of the hours the Zieglers worked, and thus, violated the FLSA's recordkeeping requirement; and (3) the Zieglers were not paid for overtime in violation of the FLSA and are entitled to judgment as a matter of law as to Tower's liability for FLSA violations, with the amount of liability to be determined at trial. The Zieglers' motion does not address the retaliation claim.

Defendant Tower "concedes that Plaintiffs are entitled to summary judgment on both their misclassification argument as well as their FLSA recordkeeping claim."  However, Tower asserts that "there is a genuine issue of material fact as to whether Plaintiffs ever worked over forty hours in a workweek."  (Def. Response Br., Doc. 45, at 1-2).   Accordingly, the only request in the Zieglers' motion that remains disputed is the third request: that the court make the determination as a matter of law that Tower violated the FLSA by not paying them overtime wages.

Tower's motion is also one for partial summary judgment, requesting (1) a ruling that the on-call hours were not compensable under the FLSA; and (2) a ruling *either* that the retaliation claim is due to be dismissed because of collateral estoppel *or* that judgment in favor of Tower is due to be entered on it because the Zieglers failed to establish their *prima facie* case and failed to

establish that Tower's legitimate reason for the termination was pretext for discrimination.

## I.  Count One: FLSA Violation for Failure to Pay Overtime

### A.  Misclassification

The court FINDS that Tower misclassified the Zieglers as salaried employees, and that the Zieglers are entitled to be compensated at the overtime premium rate of pay for every hour each of them worked in excess of forty hours per week.  Tower, who has the burden of establishing that its employees fall into a statutory exception to the FLSA's overtime pay requirements, concedes, for the purposes of summary judgment, this misclassification issue (Def.'s Resp. Br. Doc. 45, at 1), and the undisputed evidence supports the Zieglers' argument on this point.  Accordingly, the Zieglers are entitled to summary judgment in their favor on this issue; the court WILL GRANT the Zieglers' motion as to misclassification.  Therefore, the Zieglers do not fall into a statutory exception to the FLSA's overtime pay requirement, so the company was responsible to pay the Zieglers overtime if they worked more than 40 hours per week and if Tower had notice that they did so.

### B.  Tower's Failure to Keep Required Records

The FLSA requires that employers keep accurate records of the hours worked by employees entitled to overtime pay. 29 USC § 211(c); 29 CFR 516.2; *see also Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1315-16 (11th Cir. 2007) (stating that "[a]lthough a FLSA plaintiff bears the burden of proving that he ... worked overtime without compensation ... [i]t is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment.").  The court FINDS that Tower failed to keep records of the Zieglers' actual overtime hours worked, and thus, failed to comply with its record-keeping obligations set

forth in the FLSA; Tower concedes this issue.   (Def. Resp. Br. Doc. 45, at 1).  Accordingly, this

court FINDS that the Zieglers are entitled to summary judgment in their favor as to the FLSA

record-keeping claim; the court WILL GRANT the Zieglers' motion on this issue.

<u>C.  Overtime</u>

The court's findings that the Zieglers are entitled to overtime compensation *if* they

worked overtime and that Tower failed to keep records of overtime hours worked does not

necessarily mean that the Zieglers have proven that they are entitled to overtime as a matter of

law.  Predictably, the Zieglers assert that they have presented undisputed proof of overtime work,

and thus, they are entitled to judgment as matter of law on liability.  Although liability is not

sufficiently disputed, they acknowledge that the amount of damages is in dispute and that a jury

must determine the exact amount of overtime wages due.

On the other hand, Tower asserts that a genuine issue of material fact exists about

whether the Zieglers ever worked over 40 hours in a workweek.

As to the issue whether the Zieglers have proven that they worked overtime for which

they were not paid, the court agrees with the Zieglers and disagrees with Tower.  The court

FINDS that the undisputed evidence reflects that the Zieglers regularly worked more than 40

hours per work week.  The Zieglers have so testified, giving estimates of the hours worked

regularly on weeknights and weekends,  and they have produced daily logs, on-call logs, and

other evidence that support the testimony that both Shanda and Keith regularly worked overtime.

Further, no evidence specifically *disputes* this testimony.  The Zuckermans, who

supervised the Zieglers for Tower, were in the best position, when they were in town, to know

how much the Zieglers were working.   The evidence reflects that both Dan and Janet Zuckerman

recognized that Keith was working more than 40 hours, at least during some work weeks.  Dan testified that he knew Keith was working overtime and told him he was not supposed to do so. Janet not only recognized that Keith Ziegler was working overtime, but she also notified Tower part-owner Bill Steele of Keith Ziegler's overtime work in an email; she advised him that Keith was a hard worker, "working many mornings at 6:30 am and doesn't stop many evenings till dark," describing a 10-hour work day.   (Doc. 53-3, at 104).  In short, neither the Zuckermans' testimonies nor any other evidence reflects that the Zieglers did *not* work overtime, but, in fact, the work logs *support* both Zieglers' claims of overtime work, and even the Zuckermans' testimonies and one email *support* Keith Ziegler's claims of overtime work.

Tower characterizes the Zieglers' estimates of the hours they worked as "conclusory." That characterization ignores the documentation from daily logs and on-call sheets which supports the Zieglers claim of regular overtime work.  Those documents do not always provide the exact count of hours and minutes worked over 40 hours; some of the daily logs are very precise about the hours and minutes worked but many of the on-call logs are less precise and focus more on the task performed than the hours and minutes of the task.

However, the FLSA places the duty on the *employer*, not the employee, to keep accurate "records of the employee's wages, hours, and other conditions and practices of employment." *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1315-16 (11th Cir. 2007).  When addressing an FLSA case in which the employer did not meet its duty to keep accurate records, the Supreme Court of the United States decided that this failure should not bar a plaintiff's recovery for lack of precise documentation of the number of overtime hours:

The remedial nature of this statute and the great public policy which it embodies

> ... militate against making [the plaintiff's burden of proving the hours worked] an impossible hurdle for the employee....  The solution ... is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946).   Therefore, where the employer has not fulfilled its duty of keeping records of overtime and the employee similarly lacks precise documentation, an employee nevertheless meets his burden

> if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.' The burden then becomes the employer's, and it must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.

*Allen,* 495 F.3d at 1316.

Applying this directive to the instant case, Tower's failure to keep accurate records regarding the precise hours the Zieglers worked each week does not mean that the Zieglers have failed to meet their burden.  The court FINDS that the Zieglers' testimony, supported by the notes and daily logs and on-call logs and the Zuckermans' testimony and Janet Zuckerman's email dated January 29, 2013, is sufficient evidence to show overtime work as a matter of just and reasonable inference; the Zieglers have met their burden.  Tower, in turn, has failed to produce evidence negating the existence of any overtime work.  Its evidence may raise genuine issues of material fact regarding the total *amount* of overtime worked but its evidence does not truly challenge the existence of any overtime work at all.

The court acknowledges that the Zieglers worked in an independent work setting where

no office personnel except themselves could clock them in and out or record the time they

worked.  Thus, this work setting is not one in which the employer has access to work records

such as time clock cards that the employee does not.  However, the FLSA does not provide an

exception to the employer's duty to keep overtime records in such circumstances.  Where, as

here, the employer required its employees to perform certain tasks after office hours and required

its employees to be "on-call" on a rotating schedule of nights and weekends, and where Tower

had other actual notice that the Zieglers were working long hours, Tower had notice that the

Zieglers were working more than 40 hours per week during some workweeks.  Therefore, the

employer should have met its duty of keeping accurate time records by requiring its employees to

keep accurate records of what tasks they performed for Tower outside of office hours and to log

with precision the time spent in performing those tasks.  Tower did not fulfill that duty; it did not

require the Zieglers to keep such records and did not enforce such a requirement.  Although the

Zielgers could have kept such records, the contract and other communication from Tower

supervisors and other employees indicated that they would not receive overtime pay, and the

Zieglers can hardly be faulted for failing to keep precise time records for overtime wages that

Tower told them they would not receive.   The court FINDS that the Zieglers have met the first

part of their burden: proving that they in fact performed work beyond 40 hours per week.  The

undisputed evidence reflects that they both regularly did so.

Having found that the undisputed evidence supports the Zieglers' claims that they

regularly worked more than 40 hours per week, the court further FINDS that the undisputed

evidence reflects that Tower did not pay the Zieglers overtime.   Tower acknowledges, for

summary judgment purposes, that it misclassified the Zieglers; it does not assert that it ever paid

30

them overtime wages.  Its argument is simply that the Zieglers did not work overtime, an

argument that the court has rejected.  Thus, the Zieglers have met their burden that they have "in

fact performed work for which [they were] improperly compensated."  *See Anderson,* 328 U.S. at

686-87 (stating quoted language as burden); *Allen,* 495 F.3d at 1315-16 (quoting same language).

Tower's argument on summary judgment is that, *if* the Zieglers worked overtime, Tower

did not violate the FLSA because it had no notice of the overtime, and because genuine issues of

material fact exist on the following: whether fluctuating work week provisions of the FLSA

applied; whether the meal breaks and on-call time are compensable under the FLSA rules and

regulations; and whether the fluctuating work week method of computing hours applies to the

Zieglers.

### 1. Notice to Tower

Despite Tower's claim of no notice of overtime, the evidence reflects, as noted above,

that their supervisors were aware that the Zieglers were working overtime and that they

communicated that fact to owner Steele.  And, of course, the Zuckermans received a specific

complaint of wage violations from both Zieglers when they met sometime after February 23,

2013.  Regardless of whether the Zuckermans actually passed this wage violation complaint

along to Steele, the Zuckermans received this complaint as supervisors of the Zieglers and

promised the Zieglers that they would notify Steele.  The Zieglers had attempted to discuss the

matter with Steele directly, and instead of communicating with them himself, he sent the

Zuckermans to respond on the company's behalf.  Having delegated the matter to the

Zuckermans as supervisors of the Zieglers and as company representatives to address their issues,

he cannot now hide behind the Zuckermans and claim that notifying them was not notice to the

31

company.  *See Gulf King Shrimp Co. v. Wirtz,* 407 F.2d 508, 512 (5th Cir. 1969)[5] (quoting with approval the statement that an employer "may not escape [a statutory mandate] by delegating it to others.  The duty rests on the employer to inquire into the conditions prevailing in his business.  He does not rid himself of that duty because the extent of the business may preclude his personal supervision and compel reliance on subordinates.  He must then stand or fall with those whom he selects to act for him." ); *see also Allen,* 495 F.3d at 1319 (quoting *Gulf King Shrimp* with approval).

To the extent that Tower relies on statements in the employment contract and by Dan Zuckerman to Keith Ziegler advising the Zieglers that they should not work more than 40 hours per week, and argues that those statements absolve Tower from liability for overtime, Tower's reliance is misplaced.  Dan Zuckerman did tell Keith Ziegler more than once that he should not work overtime.  However, the evidence also reflects that Zuckerman was aware Keith Ziegler continued to work overtime even *after* those admonitions and did not write Ziegler up or otherwise discipline him for doing so.  As 29 CFR § 785.11 states:  "Work not requested but suffered or permitted is work time.  For example, an employee may voluntarily continue to work at the end of the shift.  He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors ..... The reason is immaterial.  The employer knows or has reason to believe that he is continuing to work and the time is working time."   Further, the Eleventh Circuit has recognized that "'[t]he mere promulgation of a rule against [overtime]work is not enough.  Management has the power to enforce the rule and must make every effort to do so.'"

_____

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

*Reich v. Dep't of Conservation & Natural Res.,* 28 F.3d 1076, 1083 (11th Cir. 1994) (quoting 29 CFR § 785.13).  Tower did not enforce the 40-hour work limitation, and Dan Zuckerman's statement to Keith that he was not supposed to work over 40-hours "but that was up to him, if he wanted to get up" does not represent enforcement complying with the FLSA.

Further, other evidence supports the Zieglers' understanding that, even though they would only be paid for 40 hours, Tower *expected* them to perform certain tasks and be available to perform work after office hours and during weekends on-call.  In essence, the 40-hour work week limitation meant that they could not expect *overtime pay* but did not mean Tower did not expect them to perform *overtime work*.  The former Fifth Circuit has recognized that an FLSA violation occurs even when employees receive specific instructed to perform jobs in 40 hours but when the employer is aware that the instructions are to be honored in the breach by under-reporting actual work hours because completing job duties require long and irregular work hours.  *Brennan v. Gen. Motors Acceptance Corp.,* 482 F.2d 825, 828-29 (5th Cir. 1973).

Indeed, logic suggests in the instant case that Tower expected its Property Managers to work overtime when Tower assigned them on-call hours every other week for weeknights and weekends in a job where RVs would be expected to arrive and leave outside of office hours and residents would be expected to have maintenance issues outside of office hours.  The evidence follows that logic,  reflecting that a Tower supervisor advised the Zieglers in their training that the park had so much general maintenance and upkeep and that these tasks could not all be accomplished during the regular hours but they nevertheless must be accomplished.  And, Lupe Gonzales from home office laughed when Shanda referred to her seven-day work week and called it "expected."  Even the Zuckermans, who testified at one point that they themselves

performed the Property Manager duties within the confines of a 40-hour work week, acknowledged in other testimony that Janet Zuckerman sometimes worked overtime in completing those Manager duties.  (Doc. 38-3, at 163-64).  In any event, the fact that some experienced Managers may have been able to complete duties in 40 hours does not relieve Tower of its responsibility to pay the Zieglers when they worked more than 40 hours per week to complete their duties.  *See Reich,* 28 F.3d at 1083 ("The fact that some officers were able to comply with the forty-hour rule did not relieve the Department of its responsibility to ensure that the remaining officers did not violate the rule.").

In sum, the evidence reflected that Tower employees and supervisors knew the Zieglers were working overtime even after the Zieglers received instructions not to do so and that Tower did not enforce the 40 hour maximum workweek.

Because this evidence reflects that Tower had *actual* notice that the Zieglers were working overtime, the court need not analyze whether Tower had *constructive* notice of overtime.  However, as an *alternative* ruling, the court FINDS that Tower also had constructive notice that the Zieglers were working overtime because of the knowledge of Zieglers' supervisors and because of on-call hours it required of its employees.  Because of the way Tower structured on-call hours, where employees could leave the premises as long as they were available by phone, that structure did not necessarily mean that the Zieglers would work overtime on *all* on-call weeks.  However, logic suggests that overtime would naturally result on *some* on-call weeks in an RV park, with RVs arriving at all hours of the week and on weekends, and with maintenance issues arising at all hours of the week and weekends.  Given the nature of the business, Tower had reason to believe that the Zieglers were working beyond 40 hours per week,

at least on their weeks on-call.  *See Allen,* 495 F.3d at 1319 (citing 29 CFR § 785.11 and stating

that an employer has "constructive knowledge of its employee's overtime when it has reason to

believe that its employee is working beyond his shift.").  Having reason to believe that its

employees were working beyond office hours and 40-hour weeks, Tower had a duty to inquire

further and to direct its employees to accurately record their work hours, including the hours

worked outside of office hours.

In sum, the court FINDS that Tower had notice that the Zieglers were working overtime.

### 2.  On-Call

The Zieglers concede that their "on-call" time, *other than time spent actively working for

Tower*, does not satisfy the definition of work set out in opinions of the Supreme Court of the

United States and the Eleventh Circuit Court of Appeals.  (Pl.'s Resp. Br. Doc. 43, at 11; *see,

e.g., Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); *Birdwell v. City of Gadsden,* 970 F.2d

802, 808 (11th Cir. 1992)).  The court notes that the Zieglers have provided testimony, and daily

logs and on-call logs and notes supporting their testimony, that they spent a good deal of time

every week outside of office hours actually responding to calls and actively working for Tower,

which time *does* meet the definition of work.  Accordingly, the court FINDS that Tower's motion

for summary judgment is due to be GRANTED to this extent: the time that the Zieglers were on-

call or at lunch but were not actually answering calls, were not responding to calls, or were not

actively engaged in work on behalf of Tower is *not* compensable time under the FLSA.

However, Tower's motion for summary judgment is due to be DENIED as to the time that the

Zieglers were actively working on behalf of Tower during on-call and lunch hours.  The jury will

determine the amount of hours they spent during on-call time and lunch time answering calls,

35

responding to such calls, and otherwise actively engaged in work on behalf of Tower.

### 3. Fluctuating Work Week

Although the Zieglers claim entitlement to recover overtime pay based on one-and-one-half times their regular rate, Tower asserts instead that any overtime pay should be processed using the fluctuating workweek method and paid at one-half times their regular rate. For the reasons stated below, the court agrees with the Zieglers, and FINDS that the fluctuating workweek method does not apply.

Under the FLSA, an employer must pay overtime at "a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). The Act does not define the term "regular rate." However, the Supreme Court of the United States has explained: "the 'regular rate' of pay under the [FLSA] cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee[;] it must be drawn from what happens under the employment contract." *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446, 464 (1948).

Where an employee's employment contract or agreement reflects that he is paid a constant weekly salary for widely fluctuating hours, the Supreme Court of the United States held that the regular rate is properly calculated by what is now known as the "fluctuating workweek method": dividing the weekly salary by the number of hours actually worked. *Overnight Motor Transp. Co v. Missel ,* 316 U.S. 572, 580 (1942), *superceded on other grounds by statute,* Portal-to-Portal Act, 29 U.S.C. § 251 (which provides the employer with a defense to an award of liquidated damages when it can show good faith). In *Missel,* the trucking company paid a fixed salary to a rate clerk who worked varying hours, sometimes clocking long hours well over 40-hours per week logging shipments during busy seasons and working far less than 40-hour weeks

36

during off-seasons.  Because the parties had agreed to fluctuating *rates* of compensation by

agreeing to a fixed salary based on hours fluctuating by the week or by the season, the Supreme

Court found that the regular rate of compensation would rise and fall each week according to the

number of hours worked, and a court should calculate the compensation on a weekly basis with a

variable rate.  *Id.*

After *Missel,* the Department of Labor issued an interpretive rule to codify the decision at

29 CFR 778.114.  That rule, entitled "Fixed Salary for Fluctuating Hours,[6]" sets out two

[6] The rule states in relevant part as follows: "(a) An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary in such situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week.  Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.
***
(c) The "fluctuating workweek" method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act, and unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is on e in which a full schedule of hours is not worked.  Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones . . . On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek

requirements for contracts with fluctuating rates.  The first requirement is that the employee and employer must have "a clear mutual understanding" that the employment agreement's "fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek...." Put another way, the bargain between the parties must include an agreement that the fixed salary will cover base pay no matter the hours worked, even when the hours worked are much less than 40-hours in a week, *and* that the employers will pay a separate overtime bonus.

The second requirement is that the employer must pay the employee, in his regular paychecks, a contemporaneous premium for overtime hours.  *See* 29 C.F.R. § 778.114(c) (referring to contemporaneous payment in the sentence "where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than which he receives for nonovertime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek formula"*).*

In the instant case, the court FINDS that the employment agreement between the parties does not meet the requirements for the fluctuating workweek formula.  As Tower concedes, it misclassified the Zieglers as salaried workers exempt from 40-hour work weeks.  Because of this misclassification, Steele testified that he did not require Managers to keep up with overtime hours and had not understood that minimum wage laws and payment for overtime applied and would be an issue.  Similarly, the Zieglers understood that they would receive a set salary that would cover all hours no matter how many they worked, although when they realized how many hours above 40 they were routinely working each week, they complained that the salary was "not

overtime formula."
29 CFR 778.114 (a) & (c).

38

legal."

Based on such evidence, the Zeiglers and Tower never agreed to the *first* essential requirement of Section 778.114; the parties had no "clear, mutual understanding" that Tower would pay the Zieglers overtime at varying rates.  Clearly, Steele and the Zuckermans contemplated that Tower would pay the Zieglers no overtime at all, no matter how many hours over 40 they worked.  Steele so testified, and the Zuckermans, when the Zieglers complained about the illegal wages, simply responded that they had agreed to the salary as their total compensation.  Indeed, the Zieglers' wages reflect that Tower paid them a straight salary with no overtime premium or bonus.  Tower cannot assert, on one hand, that it entered into an employment agreement with the Zieglers that provides no overtime pay and then assert, on the other hand, that the agreement provided that any overtime would be paid at fluctuating rates.  The two assertions are not compatible.  Conceding misclassification under these facts means that the first essential requirement of Section 778.114 does not exist and the fluctuating workweek formula does not apply.

The court also notes that the work hours in the  instant case are not in the same category as those in *Missel* and other cases applying the fluctuating workweek method, such as *Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299 (11th Cir. 2013) and *Saxton v. Young,* 479 F. Supp. 2d 1243 (N. D. Ala. 2007).  In those cases, the jobs were seasonal, requiring long hours well over 40 some weeks and then hours well under 40 during lulls.  That situation is very different from the instant case where Steele acknowledges intending the Zielgers to work office hours of 8:00 AM to 4:00 PM every week; the only variable was how much *additional hours* they would work after hours and on-call.  The Manager job at Tower included no lulls, just

39

weeks with 35-40-hour weeks, if the Managers could fit all their duties into those hours, alternating with weeks when on-call was *added to* the normal workweek.  Tower would like to describe these hours as "fluctuating," but the more accurate description is "overtime."

Tower argues that an essential requirement of Section 778.114 is that the parties agree to a fixed salary no matter how many hours the employee works.  To the extent that Tower implies that such an agreement would encompass a fixed salary *without overtime premium wages*, no many how many hours the employee works, that assertion mischaracterizes the requirement.

The court further notes that the second requirement of Section 778.114 is a bonus or premium for overtime, calculated at a fluctuating rate.  The Zieglers' employment agreement did not encompass such an overtime bonus, and their wages never included an overtime premium payment, despite the hours over 40 that they regularly worked.  Steele testified that he believed the Ziegler's contract with the salary "and giving them, you know, space rent and a house and so on and so forth" meant that he did not have to pay them overtime. (Doc. 38-2, at 35-36, at pp. 33-34 ).  He appears to be saying that the Zieglers' employment contract, which did not provide for overtime but provided lodging, could somehow meet or waive the FLSA's requirement to pay overtime.  To the extent, if any, that Steele and Tower assert that the Managers' lodging counts toward the minimum salary required to qualify the Zieglers as exempt from the FLSA salary and overtime requirements, 29 C.F.R. § 541.600 states that "costs incurred by an employer to provide an employee with board, lodging, or other facilities *may not count* towards the minimum salary amount required for an exemption." (emphasis added).  Tower provides no support for any argument that such lodging costs, available during the full employment tenure,  fulfill the requirement of  premium overtime wages, due *in addition to* regular wages for weeks of overtime

work.

In any case, to the extent that Tower argues that its employment agreement with the Zieglers operates as a waiver of the Zieglers' statutory right to an extra premium for overtime because its flat salary with lodging was generous compensation for long hours, that argument fails; enforcing contract provisions that waive FLSA rights would violate the FLSA. *See Barrentine v. Arkansas-Best Freight Sys.,* 450 U.S. 728, 740 (1981) (stating "FLSA rights cannot be abridged by contract" because allowing employment contracts to violate the FLSA by agreement would "nullify the purposes of the statute"). In the *Missel* decision, the Supreme Court rejected such an argument. The Supreme Court found that the employment contract for a fixed salary did not comply with the FLSA because "it [failed to include a] provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage." *Missel,* 316 U.S. at 581. Any other result would mean that the parties could contract away the protections of the FLSA, rendering the statute meaningless.

Similarly, in the instant case, the employment contract failed to include a provision for additional pay in the event the hours worked exceeded 40 hours per week, and thus, failed to comply with the FLSA. The wages paid the Zieglers under that contract did not include additional pay for the overtime hours the Zieglers actually worked despite notice to Tower of overtime work, and thus, the wages failed to comply with the FLSA.

For all of these reasons, the court FINDS that the fluctuating workweek method does not apply to the instant case, and Tower owes the Zieglers overtime wages of one-and-one-half times their regular salary. To the extent that Tower's motion for summary judgment requests a finding that the fluctuating workweek method applies, the court WILL DENY that motion.

41

In sum, the court FINDS that the Zieglers' motion for summary judgment is due to be GRANTED as to the claim that they are due overtime wages of one-and-one-half times their regular salary for overtime they spent actively working on behalf of Tower.  The jury will determine at trial the damages due for overtime.  To the extent that Defendant's motion requests an inconsistent ruling, the court DENIES its motion.

## II.  Count II: FLSA Retaliation

In Count II of the Zieglers' Second Amended Complaint, they claim that their termination represents retaliation for complaining that their wages were illegal, and thus, that the termination violated the FLSA.  The FLSA does indeed protect persons against retaliation for asserting their rights under the statute.  29 U.S.C. § 215(a)(3).  To establish a *prima facie* case of FLSA retaliation, the Zieglers must demonstrate that "'(1) [they] engaged in activity protected under [the] act; (2) [they] subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'"  *See Wolf v. Coca-Cola, Co.,* 200 F.3d 1337, 1342 (11th Cir. 2000) (quoting with approval *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 208-09 (10th Cir. 1997)); *see also Miller v. Riche Sur. & Cas. Co.,* 502 F. App'x 891, 893 (11th Cir. 2012) (citing the *Wolf* decision for elements of FLSA retaliation).  "In demonstrating the third element, causation, they must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights."  *Wolf,*  200 F.3d at 1343; *see Raspanti v. Four Amigos Travel, Inc.,* 266 F. App'x 82, 823 (11 th Cir. 2008) (quoting with approval the "but for" causation language).

Tower asserts that the Zieglers cannot establish element three, arguing that the decisionmaker, Steele, had no notice of their protected activity.  Alternatively, even *assuming*

*arguendo* that he did have such notice, Tower asserts that the Zieglers cannot establish that the protected activity was the "but for" cause of their termination.

A.  Notice of Protected Activity and *Prima Facie* Case

The Zieglers established the following protected activity: (1) their luncheon meeting with the Zuckermans sometime after February 23, 2013 in which the Zieglers complained of illegal wages based on their long hours; and (2) this lawsuit, filed on May 9, 2013.  The evidence is undisputed that Steele was the person who made and delivered the decision that Tower was terminating the Zieglers' employment.  Tower asserts that Steele had no notice until after the termination of the Zieglers' complaint to the Zuckermans about illegal wages and about their lawsuit.  The Eleventh Circuit requires a plaintiff to show evidence that the decision-maker was aware of the protected conduct.  *See, e.g., McCann v. Tillman,* 526 F.3d 1370, 1376 (11th Cir. 2008)*; see also Griffin v. GTE Fla., Inc.,* 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct; this minimum proof stems from the important requirement that the employer was actually aware of the protected expression at the time it took adverse employment action.") .

First, Steele received the Zieglers' email and passed to the Zuckermans the task of responding to them, as previously discussed.  As to the lunch meeting between the Zuckermans and Zieglers and the complaints of illegal wages, the Zieglers' evidence is that the Zuckermans promised to relay these complaints to Steele, the decision-maker on termination, and that the Zuckermans later advised the Zieglers that they had done so.  However, no evidence in the record reflects that the Zuckermans in fact advised Steele that the Zieglers were complaining of FLSA violations; evidence reflects that the Zuckermans sent an email to Steele stating that the Zieglers

43

were complaining of financial difficulties as opposed to wage violations.  Although the lunch meeting, as the Zieglers describe it, would be protected activity, the Zieglers have not proven that Steele, the decision-maker, knew about the wage violations discussions at that meeting.

Notice of the lawsuit alleging FLSA violations is a different matter.  According to the record, CT Corp, Tower's acknowledged agent for service of process in Alabama, received service of the complaint on May 13, 2013, nine days *before* the Zieglers' termination.  Steele claims that he did not learn of the lawsuit until Stacy Shellnut forwarded him notice of the suit, which means that CT Corp either did not notify him of the lawsuit or notified him after Stacy Shellnut received suit papers on May 30, 2013.  In any case, Steele provided no evidence of when or if CT Corp did notify him.  Without evidence of when CT Corp actually notified Steele, a jury could reasonably choose not to believe Steele and believe instead that a registered agent of a company would notify a company of a lawsuit within nine days of service of process.  Because Steele is only one of three Officer/Managers of Tower, and because he is the only Manager and Supervisor of the Alabama parks, he would be the Manager at Tower receiving notice of lawsuits regarding the Alabama park property.

Evidence other than service of process reflects that Steele received notice of the Zieglers' lawsuit *before* terminating them.  The evidence reflects that the Zuckermans sent Steele an email on the morning of May 20, 2013, notifying him of the Ziegler's lawsuit alleging FLSA violations.  Steele acknowledges that the address on this email is correct and further acknowledges reading the emails the Zuckermans sent him before and after this email, and he responded on May 21, 2013 to the email sent on the *evening* of May 20, 2013.  However, Steele claims that he did not receive the *morning* email until after he terminated the Zieglers on May 22,

44

2013.  His explanation for not reading the email is that he was traveling on May 21, 2013 and missed or skipped the May 20 morning email.  However, he acknowledges that he was not traveling on May 20, and the email was sent early that day, at 7:49 AM.  The copy of the email sent on May 20, 2013 at 7:49 AM has the text at the bottom of the page with unexplained white space at the top.

At the very least, the following facts raise a genuine issue of material fact whether Steele did indeed receive the email before the termination: (1) that the email was sent to Steele's correct address and the Zuckermans received no message that it was not delivered; (2) that the email was sent during the morning on a day when Steele was not traveling, although his explanation for missing it was that he was checking his emails on his iphone while traveling; (3) that the copy of the email produced as evidence contains unexplained white space where Steele's response would naturally appear, indicating that the response and response date could have been covered up when copied; (4) that Steele acknowledged reading the emails sent from the Zuckermans before and after the email in question; (5) that Steele was on a plane to Alabama on the morning of May 21, the day after the email in question was sent, and a jury could reasonably view the trip as a response to news in the 7:49 AM email about the lawsuit; (6) that Steele was already at the airport when he responded to the Zuckermans' subsequent emails, indicating that the trip was less likely to be a response to subsequent emails; (7) that when the Zieglers referred to the lawsuit at their termination meeting, Steele did not deny knowledge of the lawsuit but simply denied that the lawsuit was the reason for the termination; and (8) that Steele eventually produced the email.

For all of these reasons, the court FINDS that the evidence raises a genuine issue of

material fact that Steele knew about the Zieglers' lawsuit before he terminated them on May 22, 2013.

Further, the evidence referenced above, *combined with* close temporal proximity between the lawsuit notice and the termination, raise a genuine issue of material fact that the filing of the lawsuit was the "but for" reason for their termination.  A plaintiff can prove causation through a "close temporal proximity" between the time his employer learned about the protected activity and the date of the termination.  *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007).  "But mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (internal citations omitted).  In the instant case, the court does not rely *only* on close temporal proximity, but nevertheless, the two days between the date of the 7:49 AM email and the Zieglers' termination represent a time table that is *very* close indeed.  Further, if the finder of fact does not believe Steele's somewhat tortuous explanation for not receiving the 7:49 AM email, covering up his receipt of the email notifying him of the lawsuit makes no sense unless he was covering up the "but for" reason for the termination.   The court FINDS that the Zieglers have met their *prima facie* case on the retaliation claim *unless the doctrine of collateral estoppel prevents Keith Ziegler from proceeding with that claim*.

### B.  Collateral Estoppel

Tower next argues that the doctrine of collateral estoppel bars Keith Ziegler from establishing that retaliation was the "but-for" cause for the Zieglers' termination.  Tower asserts that the Alabama Department of Labor proceeding on Keith Zieglers' unemployment compensation represented litigation of the reason for the termination, and that the ADOL's

finding that he was terminated for soliciting a kickback bars him from re-litigating that issue here.

The doctrine of collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue raised in a prior action or proceeding and decided against that party or those in privity." *Urfirer v. Cornfield,* 408 F.3d 710, 716 (11th Cir. 2005).  The Full Faith and Credit Act, 28 U.S.C. § 1738, provides that federal courts must accord to authenticated "records and judicial proceedings of any [state] court ... the same full faith and credit" as they would receive in state court.  Although the Full Faith and Credit Act applies to state court judgments, it does not apply to unreviewed administrative decisions.  *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 794 (1986).

Nevertheless, unreviewed state agency findings can have preclusive effect under some circumstances.  Supreme Court decisions establish a three-step inquiry for determining whether a state administrative agency's unreviewed fact finding deserves preclusive effect.  The first step is to determine whether the statute under which the plaintiff asserted a claim specifically overrides the federal common law's preference for precluding the relitigation of issues already decided and litigated.  This determination requires a look at the applicable federal statute to see if it shows that Congress's intent was to push aside federal preclusion law. If so, the unreviewed agency determination will have no effect, and the inquiry need not proceed to steps two and three.  *See Elliott,* 478 U.S. at 796-97 (finding no preclusion of Title VII claims); *Astoria Fed. Sav. & Loan v. Solomino,* 501 U.S. 104, 110-12 (1991) (holding unreviewed state agency decisions have no preclusive effect on ADEA claims); *JSK v. Hendry Cnty. Sch. Bd.,* 941 F.2d 1563, 1567-1570 (11th Cir. 1991) (finding unreviewed state agency decision had no preclusive effect on claims

brought under Education for All Handicapped Children Act (EAHCA)).

In the instant case, the parties cite to no Supreme Court or Circuit Courts of Appeal cases dealing with the issue of whether Congress's intent in enacting the FLSA was to push aside federal preclusion law.  This court is aware of no such cases and is not otherwise aware of any provision in the FLSA that reflects that intent.  Indeed, Tower, the party asserting collateral estoppel, skips this step in the preclusion analysis, and neither party offers any argument about whether Congress intended the FLSA to override federal preclusion law.

Although the federal appellate courts do not appear to have addressed this issue, federal district courts sitting in Alabama have held that Congress did not intend the FLSA to override federal preclusion law.  *See, e.g., Jones v. Hamic,* 875 F. Supp. 2d 1334 (M.D. Ala. 2012); *Franks v. Indian Rivers Mental Health Ctr.,* No. CV-08-1035-W, 2014 WL 514130 (N.D. Ala. Feb. 7, 2014); *Chase v. Ace Hardware Corp.,* No. 13-00077-M, 2014 WL 517488 (S.D. Ala. Feb. 7, 2014) (DuBose, J.); *Petty v. United Plating, Inc.,* No. CV-09-1465-NE, 2012 WL 2047532 (N.D. Ala. May 31, 2012).

Having found no evidence of Congress's intent to push aside federal preclusion law, this court agrees with the other decisions listed above that Congress did not intend the FLSA to override federal preclusion law.  Thus, the court proceeds to steps two and three, which is to determine whether the state's own courts would give the ADOL's fact finding preclusive effect on the retaliation claim and whether due process is satisfied.  The Eleventh Circuit has explained: "[a] state court's decision upholding an administrative body's findings has preclusive effect if: (1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process." *Maniccia v. Brown,*

171 F.3d 1364, 1368 (11th Cir. 1999) (citing *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 482

(1982)).

Under Alabama law, collateral estoppel applies to bar litigation of an issue first raised in

an administrative proceeding when the following elements are present:

> (1) there is an identity of the parties or their privies; (2) there is identity of issues;
> (3) the parties had an adequate opportunity to litigate the issues in the
> administrative proceeding; (4) the issues to be estopped were actually litigated and
> determined in the administrative proceeding; and (5) the findings on the issues to
> be estopped were necessary to the administrative decision.

*Ex parte Buffalo Rock Co.,* 941 So. 2d 273, 277 (Ala. 2006) (internal quotations omitted).   The

Supreme Court of Alabama has acknowledged "that the doctrine of collateral estoppel may be

raised as a defense to a retaliatory-discharge claim to bar the relitigation of an issue raised and

decided in an unemployment-compensation hearing."  *Id.*  Alabama law places the burden upon

the party asserting collateral estoppel to establish the elements of that doctrine.  *See Lee L. Saad*

*Const. Co., Inc. v. DPF Architects, P.C.,* 851 So. 2d 507, 520 (Ala. 2002) (placing the burden of

establishing collateral estoppel on the party asserting it as a bar).   If Alabama's own courts

would give the agency's fact finding preclusive effect, then the third and final step requires

scrutinizing the state agency's procedures in reaching the result to measure their "quality,

extensiveness, [and] fairness."  *Montana v. United States,* 440 U.S. 147, 164 n.11 (1979).

Accordingly, the issue for the court to decide next is whether Tower has met its burden

under step two to establish the elements of collateral estoppel under Alabama law.

The record does not provide a transcript of the administrative hearing, so the hearing

decision, just over two pages, is the only evidence this court has about the hearing and decision,

other than brief references to the hearing in the deposition testimonies of Keith Ziegler and Bill

49

Steele.  Those testimonies reflect that the hearing was conducted by telephone and that both parties were represented by counsel, with Steele and the plumber as witnesses.

The hearing decision itself reflects that the parties were Keith Ziegler as claimant and his employer, Tower Communities, LLC; that one of the issues was whether Keith Ziegler was terminated for a dishonest act committed in connection with work; and that the conclusion was "that employer terminated the claimant for attempting to make a[n illegal kickback] deal with a plumbing contractor. . .." (Doc. 41-10, at 2-4).  The decision did not refer to the FLSA lawsuit as a possible reason for the termination, and did not refer to the FLSA lawsuit at all.  The decision does not refer to any opportunity to cross-examine witnesses, and does not state what discovery was requested and provided before the hearing.  Because Steele did not produce the May 20, 2013 7:49 AM email, sent to him and referring to the FLSA lawsuit, until a month after the hearing and appeal deadline, Ziegler could not have introduced that email at the hearing to support another reason for the termination and to use in any cross-examination of Steele.  Although the decision does refer to "conflicting" testimony, it does not specify the nature of the conflict except that it related to the reason that the employer terminated Keith Ziegler.  *Id.*

The court FINDS, first and foremost, that Tower has not met its burden of proving the elements of collateral estoppel as to Shanda Ziegler's claims against Tower.  Shanda Ziegler was not a party to the ADOL proceeding regarding Keith Ziegler's request for unemployment benefits and his termination from Tower.  Tower cannot even meet the first element, identity of parties, as to Shanda, and certainly cannot meet them all.  Accordingly, collateral estoppel does not bar Shanda Ziegler's claim of FLSA retaliation.

As to Keith Ziegler's claim of FLSA retaliation, the Zieglers do not deny that the first two

elements of collateral estoppel are met, but their brief focuses on the third element: adequate

opportunity to litigate.  Tower asserts in its brief that "Mr. Ziegler had every incentive to litigate

vigorously the ADOL action," noting that this lawsuit had already been filed and the ADOL

action's preclusive effect would have been foreseeable.   In addition, Tower states "[t]here is no

evidence that Mr. Ziegler *lacked any evidence* about the issues litigated in the ADOL forum that

would have rendered his ability to litigate in the ADOL forum inadequate."  (Def.'s Br., Doc. 40,

at 25) (emphasis supplied).

The Zieglers respond, however*,* that Keith Ziegler did indeed *lack evidence*:  "at the time

of [Keith Ziegler's] unemployment hearing on April 9, 2014, he lacked crucial evidence

supporting his contention that retaliation was the real cause of his termination" which was the

May 20, 2013 morning email from Janet Zuckerman to Steele discussing the Zieglers' FLSA

lawsuit*.*  Accordingly, the Zieglers argue that "[b]ecause Defendant hid the email, the hearing

officer was presented only with the evidence that support Defendant's position, not with

evidence in Defendant's sole possession that undermined its explanation of its actions.   Based

on Defendant's selective provision of evidence, the tables were tilted in Defendant's favor at the

unemployment hearing, rending collateral estoppel inappropriate."  (Pls.' Resp. Br., Doc. 43, at

23).

The court looks to Alabama law to determine what comprises an "adequate opportunity.*"*

ADOL did indeed hold a hearing addressing the reason for Keith Ziegler's termination.

However, the mere existence of an administrative hearing on the issue does not necessarily mean

that the "adequate opportunity" requirement is fulfilled.  The Supreme Court of Alabama and

federal courts sitting in Alabama following that Court's lead have reviewed each particular case

and focused on the hearing in the state proceeding to determine whether the party or parties against whom preclusion is asserted in fact had in that initial proceeding a full and fair opportunity to litigate the reason for discharge. *See, e.g., Wal-Mart Stores, Inc. v. Smitherman,* 743 So. 2d 442, 446-47 (Ala. 1999), *overruled on other grounds by Ex parte Rogers,* 68 So. 3d 773 (Ala. 2010); *Painters Dist. Council No. 38 v. Edgewood Contracting Co.,* 416 F.2d 1081, 1085 (5th Cir. 1969)[7]; *Jones v. Hamic,* 875 F. Supp. 2d 1334, 1349 (M.D. Ala. 2012) (applying Alabama law).

The Alabama Supreme Court in *Smitherman* relied on *U.S. v. Utah Const. & Min. Co.,* 384 U.S. 394, 422 (1966), a decision in which the United States Supreme Court reviewed the National Labor Relations Board's hearing to ensure that both parties had a full and fair opportunity to argue their version of the facts. The United States Supreme Court found that preclusion was appropriate in that case, "where the Board had conducted a full hearing, the parties had been represented by counsel, and both sides had had a full opportunity to present evidence and cross examine witnesses." *Garner v. Giarrusso,* 571 F.2d 1330, 1336-37 (5th Cir. 1978) (explaining the *Utah Const. & Min. Co.* decision).

In the instant case, the court does not have a transcript of the hearing before the ADOL. The record only contains the decision by the administrative hearing officer.   Although some state agency hearing decisions may contain sufficient information for a court to determine whether the proceeding provided an adequate opportunity to litigate the issue subsequently brought, the court finds that this decision does not.  The record reflects that the proceeding was conducted via

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

telephone, but it does not reflect whether Keith Ziegler had an opportunity to cross-examine witnesses via telephone.  It does not reflect whether Keith Ziegler had an opportunity to request documents from his former employer for the hearing, and, if he did, whether the "crucial" email that appeared after the hearing and appeal deadline fit the description in one or more of the categories of documents requested.

Other evidence raises the issue of possible misconduct on the part of Tower and/or Steele, its part-owner.  In his deposition testimony, Steele acknowledged that he had known about the email from the beginning of this lawsuit, filed in 2013, and his acknowledgment would mean that he knew about the email before the unemployment hearing on April 9, 2014.  Therefore, because Steele knew about the email, *if* the email fell within the documents requested for the hearing, then arguably Tower is guilty of misconduct in failing to produce the email for use at the hearing as evidence and for cross-examination of Steele; any such misconduct would have affected the adequacy of  Keith Ziegler's opportunity to litigate the issue.  In Steele's deposition testimony for this lawsuit, the Zieglers' counsel asked why he had not turned over the email earlier instead of waiting prior to the night before his deposition.  His counsel objected that the question was a discovery question, but the Zieglers' counsel responded that no objections to the breadth of the document request could justify failing to produce the email: "You can't get anything more directly on point than this." (Doc. 38-2, at 72).

This information raises the issue whether Tower and/or its counsel was/were playing a strategic but inappropriate game.  That game is attempting to "hide the ball":  concealing the email until after the unemployment hearing and deadline to appeal the hearing decision, and then, bringing out the email in this lawsuit at a time when collateral estoppel arguably prevented the

53

email from creating a genuine issue of material fact on the retaliation claim . This court does not have enough information based on the record to determine as a matter of law whether misconduct in fact occurred, but neither, under the facts presented in the record, does the court have enough information to rule out misconduct.

The middle district of Alabama has addressed this issue in *Jones v. Hamic,* 875 F. Supp. 2d 1334 (M.D. Ala. 2012).  In that case*,* the former county administrator brought an action in district court against the county commission and others, alleging that the defendants had violated the FLSA by firing her in retaliation for her complaint about change in her employment status. The defendants argued that the doctrine of collateral estoppel prevented the plaintiff from pursuing her FLSA retaliation claim.   The district court found that the state agency's determination that she was fired because she submitted "irregular time sheets" did not collaterally estop the plaintiff from subsequently contesting the reasons for her firing in federal court.

In so finding, the district court focused on the fact that, in reaching the decision, the agency did not have all of the available evidence before it because it did not have a relevant internal audit document.  That internal audit, which went over Jones's timesheets in detail and found no evidence of any improper or illegal conduct, had not been disclosed to Jones at the time of the hearing, and her employer did not provide Jones with a copy of the audit until well after the hearing.  Refusing to apply the doctrine of collateral estoppel, the court explained: "it is not at all clear that [the plaintiff] had a full and fair opportunity to litigate the issue before the [state agency]" and that "[b]ecause the defendants deprived Jones of this opportunity [to cross examine the defendant] by concealing the auditor's report, the Court sees no reason to reward their

behavior by estopping Jones from relitigating the issue with the freshly disclosed evidence." *Id.* at 1349.  Although the *Hamic* decision is not controlling on this court, this court nevertheless finds that decision persuasive.

In the instant case, the court FINDS that Tower has not met its burden of proving that Keith Ziegler had a full and fair opportunity in the administrative hearing to litigate the issue of why Tower terminated him.  Accordingly, Tower has not established the elements required under Alabama law to apply the doctrine of collateral estoppel, and the court DENIES the motion for summary judgment on that ground.

### C.  Pretext

Having determined that the Plaintiffs raise a genuine issue of material fact that Steele had notice of the lawsuit before termination, that the Zieglers have established their *prima facie* case of retaliation, and that collateral estoppel does not apply to bar the retaliation claim, the court looks to Tower to articulate a legitimate, non-retaliatory reason for the termination.  If it does so, the Zieglers must show that its proffered reason was, in fact, pretextual.  *See McDonnell Douglas,* 411 U.S. 792, 802-04 (1973) (setting out the framework for proving discriminatory intent based on circumstantial evidence).

In the instant case, Tower argues that the reason it terminated the Zieglers was Keith Ziegler's misconduct in attempting to enter into a kickback scheme with plumber Anderson.  The court finds that the proffered reason is a legitimate, non-discriminatory one, and thus, that the Zieglers have the burden to establish that the reason was pretext for discrimination.

If the employer's articulated reason for the adverse action is one that might motivate a reasonable employer to take the same action, the plaintiff "must meet that reason head on and

rebut it." *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc); *Coleman v. Redmond Park Hosp., LLC,* 2014 WL 5373699, at *(11th Cir. 2014) (per curiam) (FLSA case quoting with approval the *Chapman* language). To do so, he must "cast sufficient doubt on the defendant's proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)). He can cast doubt by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)).

In the instant case, the Zieglers argue that Steele's testimony pointing to the plumber kick-back misconduct as the reason for termination has a number of weaknesses, contradictions, and implausibilities. The following represent a couple of examples of problems with the testimony:

- Steele's testimony—that he terminated the Zieglers for kickbacks and that he had even not been notified of the lawsuit at the time of termination—contains contradictions and implausibilities discussed previously in Section IIA, above. As one example previously noted, his explanation that he did not read the May 20 7:49 AM email because he was traveling is inconsistent with his testimony that he was not traveling on May 20.

- Steele's testimony that he terminated the Zieglers for kickbacks but did not learn of the kickbacks until he was on the plane to Alabama appears to be a contradiction. His testimony does not explain why he was on the plane to Alabama in the first place if not to confront the Zieglers. Given the absence of evidence that the trip had been planned before the

May 20 emails, one reasonable explanation for the trip is that he
received the email notifying him of the lawsuit and the kickbacks on
May 20 and booked a flight to Alabama for May 21. If he had
acknowledged receiving the May 20 7:49 AM email, the impetus
behind the termination could be either the lawsuit or the kickbacks, or
both; however, the jury could view his insistence that he did not receive
the first email as a cover-up supporting the argument that the lawsuit
was the "but-for" reason.

The court FINDS that the Zieglers have pointed to enough contradictions and implausibilities

with Steele's explanation to raise a genuine issue of material fact that Tower's reason for firing

the Zieglers was a pretext for retaliation. Tower's motion for summary judgment on the FLSA

retaliation claim set out in Count II is due to be DENIED; the case will proceed to trial on that

claim.


The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 17th day of March, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

57